**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JAMES LAPORTE, individually and on behalf of all others similarly situated,**<br><br>Plaintiff,<br><br>**v.**<br><br>**IDSCAN.NET, INC.,**<br><br>Defendant. | **CIVIL ACTION NO. ________________**<br><br>**SECTION _______________**<br><br>**PROPOSED CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff James Laporte ("Plaintiff") brings this Class Action Complaint on behalf of himself, and all others similarly situated, against Defendant IDScan.net, Inc., alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to him, which are based on personal knowledge:

## NATURE OF THE CASE

1. Plaintiff brings this class action against IDScan.net for its failure to properly secure and safeguard Plaintiff's and other similarly situated current and former customers of businesses using IDScan.net's services ("Class Members") sensitive information, including names, dates of birth, contact information, driver's license or state ID numbers, and other information (collectively personally identifiable information ("PII")).

2. In addition, Plaintiff also brings this class action against IDScan.net for its failure to properly secure and safeguard Plaintiff's and Class Members' protected health information ("PHI") including medical cards.

3. PII and PHI are collectively referred to as "Private Information."

4. IDScan.net is an identity verification platform that offers ID scanning, identity verification, and fraud reduction technologies to its customers, many of whom are major corporations.

5. According to the company's website, its products are used in over 20,000 locations, and its customers include the United States Department of Homeland Security, as well as major companies like Target, Hertz, FedEx, and Caesars Entertainment.

6. Plaintiff and Class Members are individuals who were required to provide IDScan.net with their Private Information, and IDScan.net took on a duty to secure, maintain, protect, and safeguard the Private Information that it collects and stores against unauthorized access and disclosure through reasonable and adequate data security measures.

7. Despite IDScan.net's duty to safeguard the Private Information of its current and previous customers, Plaintiff's and Class Members' Private Information was compromised in a data breach that first came to light on or about September 1, 2026, through reporting by investigative journalist Brian Krebs. (the "Data Breach").

8. According to Kreb's reporting, cybercriminals were offering the private information obtained through the Data Breach for sale on a marketplace called Nexus, which offered over 153 million scans of drivers licenses, as well as over 10 million identification cards, 3 million travel documents, and nearly 579,000 medical cards.

9. The cybercriminals behind Nexus claimed to have pulled data from a data breach that had been active for over a year, and researchers monitoring the situation found that the number of listed drivers' license records grew by nearly 400,000 in just 24 hours.

10. The images available for sale in Nexus have been attributed to captures from IDScan.net, based on, among other things, the kind of images available (including IR and UV scans), and timestamps that correlate with researchers' visits to companies that use IDScan.net products, including one dispensary that has an exclusive nationwide identity-verification partnership with IDScan.net.

11. According to public reporting, the FBI has opened an investigation into the Data Breach.

12. On September 4, 2026, IDScan.net finally publicly confirmed the Data Breach, issuing notification on its website. According to the notification:

> IDScan.net has determined that an unauthorized third party may have accessed and/or copied certain customer information stored within their accounts on the IDScan.net cloud. The types of information contained within the affected data may include full names and driver's license or other government-issued identification numbers.[1]

13. Thus, as a direct and proximate result of Defendant's failure to implement and follow basic security procedures, Plaintiff's and Class Members' Private Information is now exposed to cybercriminals.

14. Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, intrusion of their health privacy, and similar forms of criminal mischief, risks which may last for the rest of their lives. Consequently, Plaintiff and Class

---

[1] *See* Notification of Data Security Incident, available at https://idscan.net/notification-data-security-incident/.

Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

15. Plaintiff, on behalf of himself and all others similarly situated, alleges claims for negligence, unjust enrichment, and declaratory judgment arising from the Data Breach. Plaintiff seeks damages and injunctive relief, including the adoption reasonably sufficient practices to safeguard the Private Information in Defendant's custody to prevent incidents like the Data Breach from reoccurring in the future, and for Defendant to provide identity theft protective services to Plaintiff and Class Members for their lifetimes.

**PARTIES**

16. Plaintiff James Laporte is an adult, who at all relevant times, was a resident and citizen of the state of New York.

17. Plaintiff has suffered actual injury from having his Private Information exposed and/or stolen as a result of the Data Breach, including: (a) required mitigation efforts, including researching the Data Breach and needing to monitor financial statements to ensure his information is not used for identity theft and fraud; (b) damages to and diminution of the value of his Private Information, a form of intangible property that loses value when it falls into the hands of criminals; (c) loss of privacy; and (d) continuous imminent and impending injury raising from increased risk of financial identity theft and fraud.

18. As a result of the Data Breach, Plaintiff will continue to be at a substantial and certainly impending risk for fraud and identity theft, and their attendant damages, for years to come.

19. Defendant IDScan.net is a Delaware corporation with its principal place of business located at 2045 Lakeshore Drive, Suite 526, New Orleans, LA 70122.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class is a citizen of a state different than Defendant.

21. This Court has personal jurisdiction over Defendant because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant reside in this District.

22. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

## FACTUAL BACKGROUND

23. IDScan.net is an identity verification company that offers ID scanning, identity verification, and fraud reduction technologies to its customers, many of whom are major corporations.

24. Plaintiff and Class Members are and/or were customers of businesses using IDScan.net's identity verification services.

25. As a condition of obtaining services from IDScan.net's customers, Plaintiff and Class Members directly or indirectly entrusted IDScan.net with their sensitive Private Information.

26. Plaintiff and Class Members value the confidentiality of their Private Information and, accordingly, have taken reasonable steps to maintain the confidentiality of their Private Information.

27. In turning over their Private Information, Plaintiff and Class Members reasonably expected that their sensitive information would be protected.

28. By obtaining, collecting, and storing Plaintiff's and Class Members' Private Information, IDScan.net assumed equitable and legal duties to safeguard Plaintiff's and Class Members' sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

29. Despite these duties, IDScan.net failed to implement reasonable data security measures to protect Plaintiff's and Class Members' Private Information and ultimately allowed threat actors to breach its computer systems and exfiltrate Plaintiff's and Class Members' Private Information.

**THE VALUE OF PRIVATE INFORMATION AND EFFECTS OF UNAUTHORIZED DISCLOSURE**

30. IDScan.net understood that the Private Information it collected was highly sensitive and of significant value to those who would use it for wrongful purposes.

31. IDScan.net also knew that a breach of its computer systems, and exposure of the Private Information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised.

32. These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, and many others.

33. Private Information has considerable value and constitutes an enticing and well-known target to hackers. Hackers can easily sell stolen data as there has been "proliferation of

open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[2]

34. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[3]

35. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2024, there were 6,670 publicly disclosed data breaches, exposing 16.8 billion records. The United States specifically saw a 12% increase in the total number of data breaches.[4]

36. Indeed, a 2022 poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[5]

37. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 6.5 million people in 2024.[6]

---

[2] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last visited August 27, 2026).

[3] *What To Know About Identity Theft, FTC Consumer Advice* (Sept. 2024), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited August 27, 2026).

[4] *2025 Global Threat Intelligence Report*, Flashpoint (Mar. 18, 2025), https://go.flashpoint.io/2025_GTIR (last visited August 27, 2026).

[5] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, Forbes (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last visited August 27, 2026).

[6] *Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-

38. Artificial Intelligence ("AI") is also reshaping the cybersecurity landscape. "AI-related [common vulnerabilities and exposures] have surged, with 2,130 disclosed in 2025 alone –a 34.6% year-over-year increase."[7] Further, 16% of all breaches in 2025 involved attackers using AI.[8]

39. The ramifications of IDScan.net's failure to keep Plaintiff's and Class Members' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[9]

40. The exposure of highly sensitive personal information creates ongoing risk because "when highly sensitive types of data are exposed, the breach is only the beginning."[10] That risk persists as "[e]very breach feeds an underground ecosystem of exposed data. When attackers

---

cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited August 25, 2026) (last visited August 27, 2026).

[7] Peter Girnus et al., *Fault Lines in the AI Ecosystem: TrendAI State of AI Security Report*, Trend Micro (Mar. 3, 2026), https://www.trendmicro.com/vinfo/us/security/news/threat-landscape/fault-lines-in-the-ai-ecosystem-trendai-state-of-ai-security-report (last visited August 27, 2026).

[8] *Cost of a Data Breach Report 2025*, IBM (2025), https://www.ibm.com/downloads/documents/us-en/131cf87b20b31c91 (last accessed August 25, 2026)

[9] *Report to Congressional Requesters, Personal Information, June 2007*, U.S. Gov't Accountability Office, https://www.gao.gov/new.items/d07737.pdf, (last visited August 25, 2026).

[10] Matt Cullina, *Small Breaches, Big Consequences*, Forbes (June 10, 2026), https://www.forbes.com/councils/forbesbusinesscouncil/2026/06/10/small-breaches-big-consequences/ (last visited August 27, 2026).

obtain highly sensitive identity credential, they rarely use them just once. Instead, they combine information from multiple breaches to construct detailed identity profiles that can be exploited many time across different fraud scheme."[11]

41. Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

42. Moreover, a company does not become less likely to experience another breach simply because it has already experienced one; to the contrary, "[o]nce hackers realize an organization is vulnerable to an attack, they will repeatedly attempt to breach its network[.]" Further, "95% of organizations surveyed by IBM between March 2022 and March 2023 said they had experienced more than on data breach."[12]

43. Other research indicates that "[t]wo-thirds of companies that experience cyberattack are hit again within a year. These successive incidents can play out in multiple ways: simultaneously, a few days apart, or many months later."[13]

---

[11] *Id.*

[12] Beth Stackpole, *MIT Report Details New Cybersecurity Risks*, MIT Sloan (Apr. 30, 2024), https://mitsloan.mit.edu/ideas-made-to-matter/mit-report-details-new-cybersecurity-risks (last visited August 27, 2026).

[13] Neil Clauson, *When Cyberattackers Strike Again – and Again*, Mimecast (Nov. 13, 2024), https://www.mimecast.com/blog/when-cyberattackers-strike-again----and-again/ (last visited August 27, 2026).

44. "It can take an average of 277 days – that's about nine months – for an organization to identify and contain a breach. During that extended period of time, not only might cybercriminal remain in the environment wreaking havoc, but the means by which they entered remains available to others as well."[14]

45. The specific types of personal data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and other Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

46. **Passport Numbers** - As explained by Aura, a leading identity theft protection service, "[p]assports are among the most widely accepted forms of identification, making them prime targets for scammers and fraudsters. If scammers steal your passport number, they can impersonate you, create fake travel documents, or even open bank accounts in your name."[15] Indeed, when combined with other PII, such as a name, address, or picture, a "passport number enables scammers to impersonate you, access your online accounts, or target you in sophisticated scams that lead to identity theft."[16]

47. Moreover, "[u]nlike credit card data or personal Social Security numbers, there are few mechanisms in place to alert consumers that their passport numbers have been stolen and possibly used for fraud" making it difficult to determine if criminals are using a forged or fraudulent passport in an individual's name.[17]

---

[14] *Id.; see also Cost of a Data Breach*, *supra* n.14.
[15] Yaniv Masjedi, *What Can Scammers Do With Your Passport Number*?, Aura (Apr. 12, 2023), https://www.aura.com/learn/what-can-someone-do-with-your-passport-number#:~:text=If%20scammers%20steal%20your%20passport,could%20still%20be%20at%20risk (last visited August 27, 2026).
[16] *Id.*
[17] Kate Fazzini, *Here's how criminals use stolen passport information*, CNBC (July 5, 2019), https://www.cnbc.com/2019/07/05/how-criminals-use-stolen-passport-information.html.

48. Based on the value to cybercriminals of the customer PII in its possession, IDScan.net knew or should have known the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its data security systems were breached. IDScan.net failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

**IDSCAN.NET BREACHED ITS DUTY TO PROTECT CUSTOMERS' PRIVATE INFORMATION**

49. On or about September 1, 2026, IDScan.net became aware of a cybersecurity event.

50. While reporting has suggested that IDScan.net began notifying potential customers about the incident, the company has not yet issued any public statement about the incident.

51. The information compromised during the Data Breach includes, at the very least, personal information provided to IDScan.net including names, driver's licenses, contact information, state ID numbers, medical cards, and other information.

52. As set forth below, despite this threat, and other known threats, upon information and belief, IDScan.net failed to take any action to increase security of the Private Information it held and knew to be highly valuable to cybercriminals.

53. The Data Breach occurred as a direct result of IDScan.net's failure to implement and follow basic security procedures to protect its current and former customers' Private Information that it had collected and stored.

54. The Data Breach was magnified by IDScan.net's failure to identify that the breach was ongoing for approximately a year.

**IDSCAN.NET FAILED TO COMPLY WITH FTC GUIDELINES**

55. IDScan.net is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain

reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

56. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[18]

57. Among other guidance, the FTC recommends the following cybersecurity guidelines for businesses in order to protect sensitive information in their systems: [19]

a. Identify all connections to the computers where sensitive information is stored;

b. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

c. Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

d. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e. Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

---

[18] *Start with Security – A Guide for Business*, United States Federal Trade Comm'n (Aug. 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf (last visited August 27, 2026).
[19] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited August 25, 2026).

g. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

58. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[20]

59. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

[20] *Id.*

60. IDScan.net failed to properly implement basic data security practices. IDScan.net's failure to employ reasonable and appropriate measures to protect against unauthorized access to its customers' PII constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

61. IDScan.net was at all times fully aware of its obligations to protect the PII of its customers given the reams of PII that it had access to. IDScan.net was also aware of the significant repercussions that would result from a failure to properly secure the Private Information it maintained.

**IDSCAN.NET'S FAILURE TO PREVENT, IDENTIFY, AND TIMELY REPORT THE DATA BREACH**

62. IDScan.net failed to take necessary precautions or employ adequate measures necessary to protect its computer systems against unauthorized access and keep Plaintiff's and Class Members' Private Information secure.

63. The Private Information that IDScan.net allowed to be exposed in the Data Breach is the type of private information that IDScan.net knew or should have known would be the target of cyberattacks.

64. Despite its own knowledge of the inherent risks of cyberattacks, and notwithstanding the FTC's data security principles and practices,[21] IDScan.net failed to disclose that its systems and security practices were inadequate to reasonably safeguard individuals' Private Information.

65. The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if

[21] *Protecting Personal Information: A Guide for Business*, Fed. Trade Comm'n (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited August 27, 2026).

a breach occurs.[22] Immediate notification to individuals impacted by a data breach is critical so that those impacted can take measures to protect themselves.

**THE DATA BREACH'S INCLUSION OF PHI IS PARTICULARLY SIGNIFICANT**

66. With respect to the data breaches implicating PHI, a study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[23]

67. "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[24]

68. The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[25]

69. Health information, in this case medical cards, in particular is likely to be used in detrimental ways - by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[26]

70. "These ransomware groups have established healthcare as a target vertical due to the critical nature of health data and the perceived willingness of healthcare organizations to pay

---

[22] *Id.*
[23] *70% Of Data Involved In Healthcare Breaches Increases Risk Of Fraud*, DistilINFO (Oct. 3, 2019), https://distilgovhealth.com/2019/10/03/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud/ (last visited August 27, 2026).
[24] *Id.*
[25] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited August 27, 2026).
[26] *Id.*

ransoms to avoid disruption of patient care and regulatory consequences under frameworks such as HIPAA."[27]

71. Health information "remains one of the most valuable commodities in the cybercriminal underground due to its permanence, sensitivity and ability to support multiple forms of fraud simultaneously."[28]

72. Cybersecurity threat researchers warn that, "[w]hat we're seeing is not isolated cybercrime, but a mature underground economy built around healthcare." Health information has become such a valuable commodity that, "[i]nitial access brokers, ransomware affiliates, credential sellers and fraud specialists now operate as a part of an interconnected supply chain designed to monetize patient data repeatedly and at scale."[29]

73. As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals - they can access a customer's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to - we've even seen $60 or $70."[30]

---

[27] Stephen Hilt et al., *The Cybercriminal Underground: Mapping the Healthcare Data Economy*, TrendAI (June 4, 2026), https://www.trendaisecurity.com/en-us/resources-insights/research/the-cybercriminal-underground-mapping-the-healthcare-data-economy (last visited August 27, 2026).

[28] Sarah Weston, *Healthcare Data Has Become One of Cybercrime's Most Valuable Commodities*, Intelligent CISO (June 9, 2026), https://www.intelligentciso.com/2026/06/09/healthcare-data-has-become-one-of-cybercrimes-most-valuable-commodities/ (last visited August 27, 2026).

[29] *Id.*

[30] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idx.us/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat (last visited August 27, 2026).

74. The "high value of medical records on the dark web has surpassed that of social security and credit card numbers. These records can sell for up to $1,000 online . . ."[31]

75. Specialized medical records carry an even higher price. For example, "oncology medical records can be worth between $950 and $2,000 per patient, and genomic data alone can command $1,700 to $5,000. When genomic data is linked with phenotypic data…the value can exceed $6,000."[32]

76. Cybercriminals sell health information at a far higher premium than stand-alone PII. This is because health information enables thieves to go beyond traditional identity theft and obtain medical treatments, purchase prescription drugs, submit false bills to insurance companies, or even undergo surgery under a false identity. The shelf life for this information is also much longer—while individuals can update their credit card numbers, they are less likely to change their health insurance information. When medical identity theft occurs, the associated costs to victims can be exorbitant. According to a 2015 study, at least 65% of medical identity theft victims had to "pay an average of $13,500 to resolve the crime."[33]

77. As noted above, some of the information that was compromised in the Data Breach included, among other things, medical cards. Accordingly, Plaintiff and Class Members must remain especially vigilant given the highly sensitive nature of the PHI at issue in this Data Breach.

**PLAINTIFF AND CLASS MEMBERS SUFFERED DAMAGES**

---

[31] Steger, *supra* n. 32.
[32] Seth Joseph, *What Is Your Health Record Worth? The Unseen Economics Behind Your Medical Data*, Forbes (Aug. 20, 2025), https://www.forbes.com/sites/sethjoseph/2025/08/20/what-is-your-health-record-worth-the-unseen-economics-behind-your-medical-data/ (last visited August 27, 2026).
[33] Justin Klawans, *What is medical identity theft and how can you avoid it?*, The Week (Aug. 2, 2023), https://theweek.com/feature/briefing/1025328/medical-identity-theft-how-to-avoid (last visited August 27, 2026).

78. Plaintiff is a natural person and a citizen of New York.

79. In or around 2026, Plaintiff visited a FedEx store that required scanning his government-issued identification in order to complete his transaction.

80. Plaintiff presented his government-issued identification to the Fed-Ex employee at the counter. The employee proceeded to scan Plaintiff's government-issued identification.

81. The scanned license contained Plaintiff's name, photograph, address, date of birth, driver's-license number, signature, physical descriptors, issuance and expiration dates, and machine-readable barcode information.

82. Plaintiff provided his license solely to verify his identity and complete a business transaction. He did not authorize the retention, commercial exploitation, or disclosure to criminals of his license or the information it contains.

83. Based on the business's documented relationship with Defendant, the Defendant's confirmation of a Data Breach, and the date and circumstances of Plaintiff's scan, Plaintiff alleges on information and belief that his license information was maintained in Defendant's affected data storage and was at substantial risk of exposure in the Data Breach.

84. The ramifications of IDScan.net's failure to keep Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

85. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct. Further, the value of Plaintiff's and Class Members' Private Information has been diminished by its exposure in the Data Breach.

86. PII remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, credit card information can be sold at a price ranging from $10 to $240, and bank details have a price range of $30 to $4,255.[34] "Fullz" packages, which includes "extra information about the legitimate credit card owner in case" the scammer's "bona fides are challenged when they attempt to use the credit card" are also offered on the dark web.[35]

87. Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their Private Information as a result of the Data Breach. A recent study found that "[v]ictims of identity theft (24%) were twice as likely as nonvictims (11%) to learn that an entity with their personal information experienced a data breach in the past year."[36]

88. Further, Plaintiff and Class Members have incurred and will incur out of pocket costs for protective measures, such as identity theft protection, credit monitoring, credit report fees, credit freeze fees, and similar costs related to the Data Breach.

89. Besides the monetary damage sustained in the event of identity theft, consumers may have to spend hours trying to resolve identity theft issues. For example, the FTC estimates

---

[34] Ben Luthi, *Here's What Your Data Sells for on the Dark Web*, Experian (June 30, 2025), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited August 27, 2026).
[35] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor (Apr. 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited August 27, 2026).
[36] Erika Harrell, *Just the Stats: Data Breach Notifications and Identity Theft, 2021*, Bureau of Justice Statistics (Jan. 2024), https://bjs.ojp.gov/data-breach-notifications-and-identity-theft-2021 (last visited August 27, 2026).

that it takes consumers an average of 200 hours of work over approximately six months to recover from identity theft.[37]

90. Plaintiff and Class Members are also at a continued risk because their information remains in IDScan.net's systems, which the Data Breach showed are susceptible to compromise and attack and are subject to further attack so long as IDScan.net fails to take necessary and appropriate security and training measures to protect the Private Information in its possession.

91. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their Private Information to strangers.

92. As a result of IDScan.net's failure to prevent the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer injuries, including out of pocket expenses; loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Data Breach; theft of their valuable Private Information; the imminent and certainly impeding injury flowing from fraud and identity theft posed by their Private Information being disclosed to unauthorized recipients and cybercriminals; damages to and diminution in value of their Private Information; and continued risk to Plaintiff's and the Class Members' Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as IDScan.net fails to undertake appropriate and adequate measures to protect the Private Information entrusted to it.

[37] Kathryn Parkman, *How to Report identity Theft*, ConsumerAffairs (Feb. 17, 2022), https://www.consumeraffairs.com/finance/how-to-report-identity-theft.html (last visited August 27, 2026).

## CLASS ACTION ALLEGATIONS

93. Plaintiff brings this class action on behalf of himself and all other individuals who are similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

94. Plaintiff seeks to represent a class of persons to be defined as follows:

> All individuals in the United States whose Private Information was compromised in the Data Breach (the "Class").

95. Excluded from the Class are Defendant, their subsidiaries and affiliates, officers and directors, any entity in which Defendant have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

96. This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when she moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

97. **Numerosity:** Plaintiff is informed and believes, and thereon alleges, that there are at minimum, 153 million members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach.

98. **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

a. Whether Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' Private Information, and breached its duties thereby;

c. Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

d. Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct.

99. **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class were all customers who used Defendant's services, and each had their Private Information exposed and/or accessed by an unauthorized third-party.

100. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

101. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

102. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendant breached their duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

103. **Injunctive Relief:** Defendant have acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

104. **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

## CLAIMS FOR RELIEF

### COUNT I – NEGLIGENCE
**(On Behalf of Plaintiff and the Class)**

105. Plaintiff incorporates by reference allegations in paragraphs 1-92 above as if fully set forth herein.

106. Plaintiff and Class Members provided their non-public Private Information to Defendant as a condition of obtaining services from Defendant's customers.

107. Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in securing, safeguarding, storing, and protecting the PII and PHI they collected from them as a condition of obtaining services from IDScan.net's customers. This duty included ensuring that the PII and PHI would not be compromised, lost, stolen, accessed and misused by unauthorized

parties. More specifically, it included, among other things, designing, maintaining, overseeing, and testing Defendant's security systems to ensure that PII and PHI in IDScan.net's possession was adequately secured and protected.

108. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if their Private Information were wrongfully disclosed.

109. Defendant owed a duty of care to Plaintiff and Class Members to provide reasonable security, consistent with industry standards, to ensure that its systems and networks adequately protected their Private Information.

110. By assuming the responsibility to collect and store this data, Defendant had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

111. Plaintiff and members of the Class entrusted Defendant with their PII and PHI with the understanding that IDScan.net would safeguard their information.

112. Defendant's conduct also created a foreseeable risk of harm to Plaintiff and Class Members by failing to: (1) secure its systems and exercise adequate oversight of its data security protocols; (2) ensure compliance with industry standard data security practices, (3) implement adequate system and event monitoring, and (4) implement the systems, policies, and procedures necessary to prevent the Data Breach.

113. Defendant knew, or should have known of, the risks inherent in collecting and storing PII and PHI, the vulnerabilities of their systems, and the importance of adequate security. Defendant should have been aware of numerous, well-publicized data breaches in the months and years preceding the Data Breach.

114. Defendant breached its common law duty to act with reasonable care in collecting and storing the Private Information of its customers, which exists independently from any contractual obligations between the parties. Specifically, Defendant breached their common law, statutory, and other duties to Plaintiff and Class Members in numerous ways, including by:

a. failing to adopt reasonable data security measures, practices, and protocols;

b. failing to implement data security systems, practices, and protocols sufficient to protect Plaintiff's and Class Members' PII and PHI;

c. storing former customers' PII and PHI longer than reasonably necessary;

d. failing to comply with industry-standard data security measures; and

e. failing to timely disclose critical information regarding the nature of the Data Breach.

115. Defendant's failure to implement and maintain adequate data security measures to protect Plaintiff's and Class Members' Private Information created conditions conducive to a foreseeable, intentional criminal act in the form of the Data Breach. Plaintiff and Class Members did not contribute to the Data Breach or the subsequent misuse of their Private Information.

116. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

117. Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and Class Members of the Data Breach.

118. Defendant had and continues to have duties to adequately disclose that the Private Information of Plaintiff and Class Members in Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised

and when. Such notice is necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

119. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

120. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have and will suffer damages including, but not limited to: (i) the loss of value of their Private Information and loss of opportunity to determine for themselves how their PII and PHI is used; (ii) the publication and/or theft of their PII and PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII and PHI; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PII and PHI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as IDScan.net fails to undertake appropriate and adequate measures to protect it; and (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised for the rest of their lives.

121. But for Defendant's wrongful and negligent breaches of duties owed to Plaintiff and Class Members, the Private Information of Plaintiff and Class Members would not have been compromised.

122. There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and Class Members and the harm, or risk of imminent harm, suffered by Plaintiff and Class Members. The Private Information of Plaintiff and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

123. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the Private Information.

124. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

125. In addition, IDScan.net had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

126. Defendant's violation of federal statutes, including the FTC Act, constitutes negligence *per se*.

127. Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession.

128. Plaintiff and Class Members are therefore entitled to damages, including restitution and unjust enrichment, declaratory and injunctive relief, and attorneys' fees, costs, and expenses.

**COUNT II – UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

129. Plaintiff incorporates by reference allegations in paragraphs 1-92 above as if fully set forth herein.

130. By its wrongful acts and omissions described herein, Defendant have obtained a benefit by unduly taking advantage of Plaintiff and Class Members.

131. Plaintiff and Class Members conferred a benefit on Defendant, whereby they provided their Private Information to Defendant to obtain services.

132. Defendant prior to and at the time Plaintiff and Class Members entrusted them with their PII and PHI, caused Plaintiff and Class Members to reasonably believe that they would keep that Private Information secure.

133. The monies Defendant were paid in its ordinary course of business included a premium for Defendant's cybersecurity obligations and were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiff's and Class Members' Private Information.

134. Defendant knew that Plaintiff and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from Plaintiff's retained data and used Plaintiff's and Class Members' Private Information for business purposes.

135. Defendant failed to disclose facts pertaining to their substandard information systems, or defects and vulnerabilities therein before Plaintiff and Class Members made their decisions to provide Defendant with their Private Information.

136. Defendant enriched itself by hoarding the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to increase their own profit at the expense of Plaintiff and Class Members by utilizing cheap, ineffective security measures and diverting those funds to their own personal use. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize their own profits over the requisite security and the safety of their Private Information.

137. Defendant failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiff and Class Members, and as a result, Defendant was overpaid.

138. Under principles of equity and good conscience, Defendant should not be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon them.

139. Plaintiff and Class Members have no adequate remedy at law.

140. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the Private Information.

141. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from their wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

**COUNT III – DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

142. Plaintiff incorporates by reference allegations in paragraphs 1-92 above as if fully set forth herein.

143. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

144. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' Private Information and whether IDScan.net is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that IDScan.net's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her PII and remains at imminent risk that further compromises of her PII will occur in the future.

145. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. IDScan.net owes a legal duty to secure customers' Private Information and to timely notify impacted individuals of a data breach under the common law, HIPAA, and various state statutes; and

b. IDScan.net continues to breach this legal duty by failing to employ reasonable measures to secure Private Information in its possession.

146. This Court also should issue corresponding prospective injunctive relief requiring IDScan.net to employ adequate security protocols consistent with law and industry standards to protect Private Information in IDScan.net's data network.

147. If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at IDScan.net. The risk of another such breach is real, immediate, and substantial. If another breach at IDScan.net occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and she will be forced to bring multiple lawsuits to rectify the same conduct.

148. The hardship to Plaintiff if an injunction is not issued exceeds the hardship to IDScan.net if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft

and other damage. On the other hand, the cost to IDScan.net of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and IDScan.net has a pre-existing legal obligation to employ such measures.

149. Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at IDScan.net, thus eliminating the additional injuries that would result to Plaintiff and customers whose confidential information would be further compromised.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A. For an Order certifying this action as a class action, appointing Plaintiff as class representative for the Class, and appointing his counsel to represent the Class;

B. For equitable relief enjoining IDScan.net from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII and PHI, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C. For equitable relief compelling IDScan.net to utilize appropriate methods and policies with respect to customer data collection, storage, and safety, and to disclose with specificity the types of PII and PHI compromised as a result of the Data Breach;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of IDScan.net's wrongful conduct;

E. Ordering IDScan.net to pay for not less than ten years of credit monitoring services for Plaintiff and Class Members;

F. For an award of actual damages, compensatory damages, statutory damages, and

statutory penalties, in an amount to be determined, as allowable by law;

G. For an award of punitive damages, as allowable by law;

H. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

I. Pre- and post-judgment interest on any amounts awarded; and

J. Such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: September 8, 2026

Respectfully submitted,

Reagan C. Thomas

Reagan C. Thomas
La. Bar No. 38522
**AYLSTOCK WITKIN KREIS & OVERHOLTZ PLC**
17 E. Main Street, Suite 200
Pensacola, Florida 32502
Tel: (850) 202-1010
rthomas@awkolaw.com

Jean S. Martin*
NC Bar No. 25703
**AYLSTOCK WITKIN KREIS & OVERHOLTZ PLC**
17 E. Main Street, Suite 200
Pensacola, Florida 32502
Tel: (850) 202-1010
jmartin@awkolaw.com

*Attorneys for Plaintiff and the Proposed Class*

***pro hac vice admission to be submitted***